In re CHICAGO RAPID TRANSIT CO. et al.

THOMAS et al. v. FALLON et al.
No. 10523.

United States Court of Appeals, Seventh Circuit.
April 18, 1952.

course of a very complex public utility reorganization proceeding, may authorize the payment by the debtor of the sum of $1,125,-000 to compromise mutual claims between the debtor and a former lessor solely on the basis of expediency and the desire to forestall further lengthy and expensive litigation, with no attempt at considering the relative merits of the conflicting claims of the parties. The disputed claims arose out of the operation by the debtor's trustees of the former lessor's lines for a period of ten years and eight months from the effective date of the disaffirmance of the lease by court order until sale and transfer of all the debtor's property to the Chicago Transit Authority. An unusual feature of the compromise offer is that it was not initiated by either of the disputing claimants—the trustee or the lessor, but instead was negotiated by some 40% of the bondholders of the debtor strictly as a "businessman's settlement" without any consideration of the merits.

The parties to this appeal are (1) a group of bondholders of the debtor, approximately 11% in amount, who contend that the amount authorized is grossly excessive and its allowance a clear abuse of discretion in the absence of any findings of fact on the merits; (2) the Securities and Exchange Commission (hereafter referred to as SEC) which supports the position of these objecting creditors and contends further that expediency alone is no basis for the settlement of the mutual claims here involved; (3) the lessor which asserts that the compromise is a fair one; and (4) the debtor's trustee who asserts that it should be affirmed by this court because there has been no showing of abuse of discretion on the part of the District Court in approving it.[1]

The facts briefly stated are that in 1903 the Union Stockyards and Transit Company which then owned certain transit facilities in the City of Chicago including about three miles of right of way and tracks running east and west from near Lake Michigan to the Stockyards was required

Edward S. Macie, Chicago, Ill., for appellants.

Thomas B. Hart, J. Kirk Windle, Edward P. McGuire, all of Chicago, Ill., Roger S. Foster, General Counsel, David Ferber, Special Counsel, Myer Feldman, Attorney, all of Washington, D. C., for Securities and Exchange Commission.

John D. Black and Frank H. Towner, for Chicago Junction Ry. Co., appellee, and Thomas L. Marshall, David A. Watts and Herbert M. Johnson, Chicago, Ill., for Bernard J. Fallon, Trustee, etc., appellee.

Before KERNER, DUFFY, and LINDLEY, Circuit Judges.

KERNER, Circuit Judge.

This appeal presents only one question, whether the District Court, during the

1. Originally two trustees had been appointed, one of whom died during the proceedings and was not replaced. We shall refer to the trustees or trustee, depending upon the stage of the proceedings reached.

by city ordinance to elevate its trackage. Instead of putting this plan into effect by itself, Stockyards worked out a plan by which operations on the elevated trackage would be integrated with those of the South Side Elevated Company. Accordingly, there was created a new corporation, the Chicago Junction Railway Company, appellee here. It acquired the right of way of the Stockyards Company, and with the proceeds of a bond issue, elevated its structure and then leased it for fifty years to the South Side Company, a predecessor of the Chicago Rapid Transit Company, the debtor here, for an annual rental of $93,080, the amount required to pay the interest on the bond issue. The line as constructed was made up of two branches, the Kenwood branch, and the Stockyards branch, which were separated by some 1700 feet of track belonging to Rapid Transit at an east-west jog in the generally north-south main line tracks of that system. The line was thereafter operated as a part of the unified elevated transportation system, some portions of which were owned by Rapid Transit and others operated under lease. Junction has never owned any property except the leased premises.

In 1932 receivers were appointed for Rapid Transit; in 1937 a petition for reorganization under § 77B of the Bankruptcy Act 11 U.S.C.A. § 207, was approved. The trustees sought to negotiate a revision of the lease and reduction of the rental—it appears of record that such efforts were successful in the case of at least one other lessor of a heavily traveled main line, the $436,000 annual rental of which was reduced by 50%. Junction refused to reduce the rental, and the trustees, on a showing that the lease was unduly burdensome and that a substantial deficit resulted from the operation of the line, were granted leave to disaffirm, effective as of February 1, 1937. However, because the lessor was a public utility operated under the authority of the Illinois Commerce Commission, the trustees were directed to continue operating the line for the account of the lessor until the latter took over operations on its own account or until physical abandonment of the line was duly authorized. The order further

provided that the trustees should file periodic accounts which should "follow substantially the method used by the trustee * * * [as to] the results of operations over the Junction branches during the years 1937 and 1938," and granted leave to Junction to file its claim for any injury it might suffer from the rejection of the lease. This order we affirmed. 7 Cir., 129 F.2d 1, certiorari denied, Chicago Junction R. Co. v. Sprague, 317 U.S. 683, 63 S.Ct. 205, 87 L. Ed. 547.

Pursuant to the leave granted, Junction filed its claim on September 30, 1941, in the amount of $434,373.33, for "reasonable rental value of the premises" from February 1, 1937 to October 1, 1941—which amount is precisely the amount of the rent reserved by the rejected lease for the period of four years and eight months. The trustees filed objections. On September 26, 1941, they filed their account of operations for approximately the same period showing an operating deficit of $589,593. Periodic accounts were filed thereafter, all but one indicating deficits in varying amounts, and all objected to by Junction. A recapitulation of the accounts to July 31, 1946 indicated a balance due to Rapid Transit from Junction of $829,519.

The accounts and objections were referred to a master, and in September 1946 he reported that the wrong method of accounting had been followed. In this report the master criticized the trustees for failure to apply for leave to abandon, construing their inaction in this respect as an election which imposed upon them all the duties of a fiduciary to operate the lines for the benefit of Junction and charge them only with actual out-of-pocket costs on a "severance" basis instead of allocating revenues and expenses generally over the entire system as a unit. The master was also critical of what he called the trustees' resistance to the efforts of Junction to assume operation of its own lines as manifested by their refusal to permit Junction the use of the 1700 feet of Rapid Transit trackage which separate the two branches of the Junction line. On the basis of this "failure of the Trustees to promptly return the property and furnish temporary rental of facilities

for Junction operations" the master found that the trustees were precluded from their claim of loss against Junction and that recovery thereon should be denied "if Trustees accounting is held proper."

The trustees filed objections to the report of the master recommending the recasting of the accounts from February 1937 on the "severance or out-of-pocket" theory, which objections were overruled by the court, and the new accounting ordered. The trustees obtained leave to engage a new expert accountant to assist in the preparation of it. This account was filed on January 15, 1948. Meantime, on September 30, 1947, the trustee had turned over all Rapid Transit properties and operations to the Chicago Transit Authority which had been organized pursuant to Illinois statute, and on the day preceding, Junction had filed a petition for the setting aside of a fund of $2,573,262.33 to be held pending final disposition of its claims against Rapid Transit, which amount, it stated, was a conservative estimate of the amounts due for the use of its property for the thirteen-year period from September 1934 through September 1947. This figure was based on the computations of an expert accountant engaged by Junction as to the value of the traffic of the two branches to the debtor estate for the period after February 1, 1937, plus the amount due for the preceding 29-month period. Since no evidence was heard as to any of these computations we have no way of knowing why these two branches whose operations had resulted in substantial deficits prior to February 1, 1937 became a bonanza thereafter resulting in earnings of over $2,000,000 for the entire period, although overall operations of the entire system resulted in a deficit for the ten-year period. It is admitted that traffic on all the lines increased during the war years, and that there was an operating profit of about $3,000,000 for certain years for the entire system, but even so, the overall result was a $212,000 deficit. Absent rejection of the lease, the rent thereon for the approximately 13-year period would have amounted to some $1,217,797.

Various hearings were had on the accounts and objections thereto. There is no question but that a peculiarly difficult problem of accounting was presented—the operation of solvent branch lines for the account of those lines by the debtor's trustees, utilizing the debtor's equipment and presumably its manpower for such operations, part of which were confined to travel only on the branch lines and the rest, as "feeder" operations to the main lines.[2] In their computations the trustees had divided through revenues on the basis of 60% to the debtor and 40% to Junction. The final accounting on the out-of-pocket basis for the ten-year and eight-month period rendered by the expert accountant engaged by the trustees at considerable expense to the estate of the debtor disclosed an indebtedness of $1,617,807 due from Junction to the debtor.

While the hearings were proceeding intermittently, a group of creditors holding about 40% of the certificates of interest which had been issued upon surrender of the various classes of mortgage bonds as a part of the reorganization plan began negotiations with Junction for the settlement of its claims. In May 1951, on the basis of a tentative agreement between these creditors and Junction to settle all mutual claims between the latter and the debtor by the payment of $1,125,000 to Junction, the matter came on for hearing before the master. The trustee had taken no part in these negotiations and originally refused to take any position on the matter. The principal proponent of the agreement on the part of the creditors testified that he regarded it strictly as a "businessman's settlement" made without any consideration of the merit or lack of merit of the Junction claim, but to be recommended only in the interest of ending the lengthy litigation and closing the estate. "We do not know the merits of this case. We do know * * * that if this thing is permitted to reach its judicial de-

---

2. After payment of rentals required to defray interest charges on the Junction bond issue was stopped, that bond issue was paid off from some undisclosed source, and since that apparently was its only obligation, its solvency was maintained intact.

termination it will take some three years * * * and we think the great majority of bondholders will feel that a settlement at this time permitting the final and complete liquidation of this estate and the final liquidation distribution * * * will be preferable to awaiting the outcome of this litigation and the dissipation of the estate through further legal costs and running expenses."

Vigorous opposition to the proposed settlement was expressed by a group holding about 11% of the certificates of interest. Their position was that there was no authority for the payment of such a substantial sum without any consideration of the relative merits of the conflicting claims. The amount proposed was about 92% of what would have been due for rent under the lease which had been disaffirmed as too burdensome. A spokesman for the objectors called attention to the testimony of the trustee's expert that, while under the abandonment theory of accounting he thought there might be $1,617,809 due from Junction to the debtor, even giving every phase of the accounting the construction most favorable to Junction, there would still be due a balance of $412,000 from Junction. This spokesman conceded that it was possible that the settlement might be an equitable one, but thought that there should be a far more definite showing before the court should recommend it, and he also thought that the trustee should be prepared to make a statement as to his position on the proposed settlement and as to the possible duration and expense of continued litigation.

Following this hearing before the master on the settlement proposal and objections thereto, the matter was sent to the court for an order directing that notice of the proposal as supported by 40% of the security holders and opposed by 11% be sent to all security holders. This notice as ordered contained a brief statement by the master as to the proposed settlement agreement, the origin of the conflicting claims, the amounts claimed by each side—$238,813 by the trustee and $1,727,185 by Junction, with a further statement that Junction had filed its claim for $2,573,262 in the re-organization proceeding. It made it clear that the proposed settlement was made without reference to the merits of either side, solely in the interest of avoiding further lengthy and expensive litigation. Enclosed therewith was a letter of the trustee briefly outlining the history of the litigation and the conflicting claims but without any expression as to his views on the proposed settlement. Objections were to be filed by June 15 and the matter was rereferred to the master for further hearing and report. There were very few responses to the notice, hence the relative proportion of proponents and objectors remained about the same, with almost half of the security holders expressing no preference.

The master issued his report on July 6, 1951, recommending approval of the compromise settlement. Objections to the report were filed by the opposition security holders and by the SEC based on the excessiveness of the amount and, in effect, the impropriety of basing a settlement on expediency alone, without any regard to the merits of the respective claims, and the absence of sufficient showing that it was proper and for the best interests of the estate. Later, on motion of the SEC, the court directed the trustee to file a statement of his position, whereupon that officer filed a written statement recommending approval of the compromise.

Hearing was had on September 28, 1951 before the District Court on the master's report, the various objections to it, the trustee's statement, and motions by the objectors and the SEC to rerefer the proposed compromise to the master for a hearing on the merits including evidence as to the reasons for the trustee's recommendation of approval of the compromise. These motions were denied forthwith. Upon the hearing the various parties reiterated the contentions previously stated by each: The objectors, "that it is a condition precedent to any compromise that the Trustee must first make a recommendation of approval and, secondly, evidence must be presented as to why this settlement is proper, fair, equitable and to the best interests of the Estate"; the SEC to the same effect, calling attention to the fact that the trustee had

stated before the master that if *all* debatable issues were resolved in favor of Junction the total liability of the estate would not exceed $891,000; counsel for the trustee, that continuation of the litigation would be so lengthy and expensive and the outcome so much in doubt that it was advisable to pay the amount agreed upon and close the matter. The trustee also testified, stating that Junction had actually operated at a profit for a few years, although the overall losses of the entire system, including Junction, for the entire period had been $212,000, and that the debtor's claim against Junction amounted to $463,756, less unpaid rent during the receivership period of $224,943, "so at the present stage of the proceedings we claim [Junction] owes us $238,813." Reference was made to numerous attempts to settle all claims for smaller amounts, and to an expression of willingness on the part of the objectors to settle for varying amounts including one statement by their counsel, which they asserted was unauthorized, that he thought they might agree to the payment of $1,000,-000. Reference was also made to a suggestion by the master of the possibility that the division of rates, 60–40, might be held on an accounting not to be fair and equitable.

Upon the conclusion of this hearing the court stated that he had not read the record before the master, but from his familiarity with the litigation and having heard the trustee's testimony and the statements of counsel for the various parties, he concluded that the settlement was fair. He further stated that he had implicit confidence in the trustee and his counsel and that he was guided almost entirely by their recommendations.

It is clear from this statement of the facts that although a variety of figures are stated as the amounts of the mutual claims, some of them supported in the record by some kind of skeleton accounts, the underlying evidence on the reference was far from complete, and there does not appear to have been any attempt to ascertain the basic legal theories responsible for the discrepancy in the amounts claimed or to reach even a rough determination as to which

claimant actually owed a balance to the other on any theory of accounting. In fact, as we have indicated, the master cut off consideration of Junction indebtedness to the debtor by assuming that what he construed as the trustees' culpable resistance to Junction's attempts to assume its own operations, which he assumed were in good faith, barred any recovery on the part of the debtor for deficit operations. While this point is not directly raised on this appeal, and mindful that we are not the finders of the facts, we must observe that from our reading of the record we think there is considerable basis for an inference that the master was unduly critical of the trustees and balanced the relative rights and duties of the trustees and Junction unfairly in favor of the latter. And the matter is significant on this appeal because it seems probable that it had some bearing on the size of the amount demanded by and allowed to Junction in that it appears to have foreclosed any offsetting claims for losses said to have been incurred by the trustees in their operation of Junction.

Far from being a privilege exercised by the election of the trustees, we think the continuation of their operation of Junction was much more likely to have been a burden imposed upon them from which no practical, feasible escape was presented. Their contention that application to the Illinois Commerce Commission for abandonment would have been a futile gesture does not seem unreasonable in view of the greatly expanded need for public transportation resulting from wartime conditions, and we think the master should have given it more consideration. Failure to apply for abandonment might also be explained by the fact that Junction was apparently trying to formulate plans for taking over its own operations. It appears from the verified answer of the trustee that Junction did in fact present two plans which were acceptable to the trustees as not likely to interfere in any way with their own main line operations. These were withdrawn by Junction, and another plan, contemplating the joint use of the 1700 feet of Rapid Transit heavy-traffic main line tracks, was substituted. From our reading of the record we

think that this proposal may well have been open to the serious objections voiced by the trustees and that, if such joint use would have substantially increased the hazards of the main line operations, as they contended on the advice of their traffic experts, they were under no obligation to permit Junction to cut across their tracks with ten trains an hour each way, as proposed. In fact, under such circumstances, we think they would have been derelict in their duty if they had not resisted by all legal means the efforts to compel them to permit such operations. After all, the primary duty of the trustees was to operate the Rapid Transit system in the best interests of the system and of the traveling public. They could not be expected to subordinate that obligation in favor of a former lessor whose principal contribution to the reorganization appears to have been a seemingly endless source of litigation.

Junction, of course, had a legal right to refuse to adjust its contractual relations at the outset of the proceedings and was entitled, under § 77B, sub. b, to creditor status in the consideration of its claim for injury resulting from the rejection of its lease. But since it was a public utility, disaffirmance did not automatically terminate relations between the debtor and the lessor. Operations had to be continued unless abandonment was duly authorized, and since the lessor owned nothing but a right of way and tracks it does not appear to have been in any position to undertake them immediately. Hence the trustees had no choice but to continue temporarily as before except for the matter of accounting, dealing as fairly as possible with Junction in the light of all their obligations. But the debtor and its other creditors are not to be prejudiced in any way by reason of the trustees' being compelled by the exigencies of wartime conditions and the paramount interest of the traveling public to continue the operations of a line which had been found very burdensome to its integrated operations. See Palmer v. Webster & Atlas Nat. Bank, 312 U.S. 156, 61 S.Ct. 542, 85 L.Ed. 642 for a holding that funds of the debtor are not to be used to its detriment in the temporary operation of a line the lease on which the trustee was permitted to reject under § 77, sub. c(2) of the Act, 11 U.S.C.A. § 205, sub. c(2), although he was required under circumstances similar to those here involved to continue operations temporarily for the account of the lessor as provided by § 77, sub. c(6).

We fully realize the desirability of settling claims without resort to litigation in bankruptcy matters as well as between individual disputants. Of course, in the latter case, ordinarily there is no occasion for a court to pass on the fairness or unfairness of a compromise settlement. Private parties may settle their differences on any basis satisfactory to themselves. And even in bankruptcy matters, which often involve many diverse interests, where any reasonable basis for compromise settlements appears they should be encouraged, and the bankruptcy court has broad discretion to approve them. It may be that acceptance by a large majority of creditors and opposition by an inconsequential number or amount would of itself constitute a reasonable basis for approval by the court without consideration of the merits of the claim or claims thus disposed of. We need not pass on that for the reason that we think that the 40% or so of security holders here favoring the settlement are not a "large majority of creditors," nor are the 11% or so opposing it an "inconsequential number." Or it might be that if the difference between the conflicting claims were comparatively inconsequential it would not be necessary to examine too closely into the question of who owed whom. But the difference in amounts which is referred to here is not that between the conflicting claims; it is that between the proposed settlement figure and that for which the objectors might have considered capitulating. Junction has asserted what appears on this record to be the utterly fantastic claim of $2,573,262.33; against that, the trustee asserts what likewise appears on this record to be a much more plausible net claim against Junction of $238,813. In this situation we think some more reasonable basis than expediency and the desire to terminate complex and troublesome litigation should be resorted to before settlement by payment

of $1,125,000 to Junction from the funds of the debtor estate when the money to be used for that payment must be withheld from distribution to the 11% objectors as well as the 40% proponents.

Of course, the trustee in recommending compromises should take into account, as he has here, the uncertainty and cost of litigation as well as the existence of unsettled questions of liability. In re National Artificial Silk Co., 6 Cir., 272 F. 938. However, we fully agree with appellants and the SEC that some inquiry should be directed by the master and the court to the question of the merits of the conflicting claims, and we also think that the trustee should be required to state his reasons for his lack of confidence in the analyses of his expert accountant who reported a net loss for the ten-year and eight-month period of $1,617,807 (reduced for reasons not disclosed in this record to $463,756) and for his fear that the estate might be held liable for up to $89' )40 or even more. There should be some statement and consideration of the legal or accounting basis for the vast discrepancy between the conflicting claims. All of these are necessary if the court is to exercise the informed and independent judgment which the Court has declared essential. National Surety Co. v. Coriell, 289 U.S. 426, 436, 53 S.Ct. 678, 77 L.Ed. 1300. And we think there should be findings of fact as required by General Order No. 47 before approval of payment from the funds of the estate of such a substantial amount of this claim. The trustee calls our attention to what he asserts are factual findings contained in the report. We think these are insufficient to show that the recommended settlement is in the best interests of the estate.

As this court stated, In re Van Camp Products Co., 7 Cir., 95 F.2d 206, 209, "the referee * * * was in duty bound to ascertain the merits of [the creditor's] claims as well as the provability and merit of the bankrupt's claims against [the creditor]." As we read this record it seems that where the master did appear in any way to base his conclusions on the merits, he did so on the basis of a misconception of the trustee's relative duties and obligations to the debtor and to Junction, and that the trustee was finally driven to take a position of approval of the "compromise" on the basis of a well-founded fear that because of that misconception, continuation of the litigation was likely to be even more expensive to the debtor estate. We think there can and should be a reexamination—or rather an examination of the legal and accounting theories which give rise to the conflict in claims, without necessarily going into the actual evidence on the accounting. Such an examination of the underlying reasons for the conflict should furnish some basis for consideration of the fairness of the proposed settlement and whether or not it would be in the best interests of the debtor estate. It might also furnish a basis for new negotiations for settlement without recourse to the lengthy and expensive hearings on the evidence on the accounting, which all parties rightly dread and seek to avoid.

The order is vacated, and the cause remanded for further proceedings.